


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.

D-1 SHINICHI TANAKA,
D-2 HIDEO NAKAJIMA,
D-3 TSUNEO CHIKARAISHI,

                    Defendants.

_____/

VIO:   18 U.S.C. § 1349
       18 U.S.C. § 1343
       18 U.S.C. § 2

Case:2:16-cr-20810
Judge: Steeh, George Caram
MJ: Stafford, Elizabeth A.
Filed: 12-07-2016 At 04:28 PM
SEALED MATTER

## INDICTMENT

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.      Airbag systems are vehicle safety devices that are intended to protect occupants in the event of a crash. Airbag systems contain, among other things, an inflator and an airbag. Airbag systems are designed so that, in the event of a vehicle collision, the airbag is deployed.

2.      When a collision occurs and an airbag system is deployed, a propellant inside the inflator quickly burns, generating a concentrated amount of gas. This gas is then expelled into the airbag, causing the airbag to inflate.

3.     Properly inflated airbags reduce the likelihood that a vehicle occupant will be injured or killed. In a collision, an airbag typically inflates within a fraction of a second. Improperly inflated airbags create a risk that a vehicle occupant could be injured or, in some instances, killed.

4.     As of September 1, 1998, all passenger vehicles sold in the United States were required to be equipped with front passenger and driver side airbags.

## Relevant Companies and Entities

5.     Takata Corp. ("Takata" or "TKJ") was a Japanese company headquartered in Tokyo, Japan. Takata was engaged in the development, manufacture, and sale of airbag systems, among other things. As of 2015, Takata was the second largest supplier of airbag systems in the world, accounting for more than 20% of all airbag systems sold that year across the globe.

6.     TK Holdings, Inc. ("TKH") was a subsidiary of Takata incorporated in the United States, which had its principal place of business in Auburn Hills, Michigan. TKH was primarily responsible for the development, testing, and production of airbag inflators that Takata sold in North America, including airbag inflators sold in the United States.

7.     Automobile Original Equipment Manufacturers ("OEMs") were companies that purchased airbag systems from Takata and installed them in vehicles

2

that they manufactured and sold. OEMs typically were car manufacturers. OEMs mandated that the airbag systems purchased from Takata had to meet strict safety and performance requirements that were expressly communicated to Takata. These requirements included specific safety and performance specifications for airbag inflators.

### The Defendants

8.      Defendant SHINICHI TANAKA ("TANAKA") was employed by Takata from in or around 1989 until in or around 2015. During his tenure at Takata, TANAKA held numerous executive-level positions. TANAKA communicated regularly with TKH regarding the design, production, and testing of airbag inflators. At different times, TANAKA physically worked at Takata facilities in Japan and the United States.

9.      Defendant HIDEO NAKAJIMA ("NAKAJIMA") was employed by Takata from in or around approximately 1975 until in or around 2015. During his tenure at Takata, NAKAJIMA held numerous executive-level positions. NAKAJIMA communicated regularly with TKH regarding the design, production, and testing of inflators. At different times, NAKAJIMA physically worked at Takata facilities in Japan and the United States.

10. Defendant TSUNEO CHIKARAISHI ("CHIKARAISHI") was employed by Takata from in or around 1978 until in or around 2015. During his tenure at Takata, CHIKARAISHI held numerous executive-level positions. CHIKARAISHI communicated regularly with TKH regarding the design, production, and testing of inflators. At different times, CHIKARAISHI physically worked at Takata facilities in Japan and the United States.

### Takata's Use of Ammonium Nitrate Inflators in its Airbag Systems

11. In or around the late 1990s, Takata, through TKH, began developing inflators that relied upon ammonium nitrate as their primary propellant. Ammonium nitrate was a highly combustible and unstable chemical compound. Takata, however, created and distributed in its inflators a purportedly safe and stable variation of ammonium nitrate as the propellant, called phase-stabilized ammonium nitrate ("PSAN").

12. From in or around 2000 through in or around at least 2015, various OEMs placed orders with Takata to purchase airbag systems that contained inflators that utilized PSAN propellant. The orders placed by the OEMs to Takata generally required that the airbag systems meet certain minimum performance and safety requirements.

4

13.     From in or around 2000 through in or around at least 2015, Takata, through TKH, produced and sold to the OEMs hundreds of millions of driver and passenger side airbag systems containing inflators that utilized PSAN propellant.

### Takata's Production of Inflator Test Reports to the OEMs

14.     Takata utilized a standardized process to develop and test inflators. This process consisted principally of two phases: (a) a design testing phase; and (b) a production testing phase.

15.     During the design testing phase, inflators were tested by TKH and information and data generated from these tests generally was compiled by TKH. This information and data typically was provided by Takata to the OEMs in a document called a Design Validation ("DV") report.

16.     During the production testing phase, a limited number of airbag system parts, including inflators, typically were assembled on a mass production line and then tested by TKH to ensure that they met each OEM's respective safety specifications. The information and data generated from these tests typically was provided by Takata to the OEMs in a document called a Production Validation ("PV") report. Takata's completion of a passing PV report and its delivery of a passing PV report to an OEM showing that the inflator met all of the OEM's safety and performance specifications typically was required before airbag systems could

be produced, sold, and distributed by Takata to the OEMs and subsequently placed by OEMs into their vehicles.

17.     At various times, additional testing was conducted by TKH during the design testing phase and production testing phase, which generated additional information and data. This testing often was conducted by TKH to address design changes or to address identified issues or problems. The information and data that was generated from these additional tests typically was memorialized in documents called "Delta" DV or PV reports. These reports generally were provided by Takata to the OEMs.

18.     Once the inflators went into mass production, a subset of inflators from each respective inflator line typically was tested regularly by TKH to ensure production quality. This testing was referred to as lot acceptance testing ("LAT"). The information and data generated from LAT testing often was provided by Takata to the OEMs.

19.     At various times throughout and following these stages, additional testing was performed by TKH. In some instances, this additional testing was performed in response to specific questions and concerns raised by particular OEMs during product development and production. In those instances, the information and

6

data gathered was generally provided by Takata to the OEMs in reports, among other forms.

20.    At all relevant times, the OEMs relied on the information and data that was generated from the tests performed by TKH and communicated to the OEMs in reports, among other forms. The OEMs relied on this data and information when making decisions about whether to purchase certain airbag systems from Takata.

## Purpose of the Scheme to Defraud

21.    The purpose of the scheme was for the defendants and others to obtain money and enrich Takata and themselves by, among other things, inducing the victim OEMs to purchase airbag systems from Takata that contained faulty, inferior, non-performing, non-compliant, or dangerous inflators by deceiving the OEMs through false and fraudulent reports and other information that concealed the true condition of the inflators, which the OEMs would not have otherwise purchased.

## The Scheme to Defraud

22.    From at least in or around 2000, when Takata began to test PSAN inflators for the victim OEMs, defendants TANAKA, NAKAJIMA, and CHIKARAISHI, along with others, knew that the PSAN inflators were not performing to the victim OEMs' specifications and that the PSAN inflators had sustained failures, including ruptures, during testing.

23.    During the course of the scheme, and in internal communications, defendants TANAKA, NAKAJIMA, and CHIKARAISHI, separately, together, and with others, routinely discussed the fabrication of test information and data, the removal of unfavorable test information and data, and the manipulation of test information and data relating to PSAN inflators contracted for purchase by the victim OEMs. For example:

a.    Defendants commonly referred to the removal or alteration of unfavorable test data that was to be provided to Takata customers as "XX-ing" the data.

b.    In or around February 2004, NAKAJIMA explained in an email to TANAKA and others that NAKAJIMA was "manipulating" test data relating to a specific PSAN inflator in production for a victim OEM.

c.    In or around February 2005, TANAKA explained in an email to NAKAJIMA, CHIKARAISHI, and one other person that they had "no choice" but to provide manipulated data intended for distribution to a particular victim OEM.  NAKAJIMA responded to the group that he, too, believed they had "no choice but to XX."

d. In or around March 2005, TANAKA sent an email to NAKAJIMA, CHIKARAISHI and others indicating "XX has been done. High and low compared to the spec."

e. In or around April 2005, TANAKA directed a junior engineer to "Please do XX" in an email that was also sent to NAKAJIMA and CHIKARAISHI.

f. In or around June 2005, NAKAJIMA explained in an email to TANAKA, CHIKARAISHI, and others, that they had no choice but to manipulate test data, and that they needed to "cross the bridge together."

24. In order to deceive the victim OEMs and induce them to purchase Takata airbag systems containing faulty, inferior, non-performing, non-compliant, or dangerous PSAN inflators, defendants TANAKA, NAKAJIMA, and CHIKARAISHI provided the victim OEMs, or caused others to provide the victim OEMs, with materially false, fraudulent, and misleading test information and data, typically contained in test reports, about the PSAN inflators. The test information and data was materially false, fraudulent, and misleading because certain test information and data provided to the victim OEMs by defendants TANAKA, NAKAJIMA, and CHIKARAISHI relating to the PSAN inflators was fabricated, removed, or altered (either by strategically adding, editing, or changing information and data).

9

25.    The false, fraudulent, and misleading test information and data (typically contained in test reports) relating to the PSAN inflators was sent and caused to be sent by defendants TANAKA, NAKAJIMA, and CHIKARAISHI to the victim OEMs in order to convince the victim OEMs that the PSAN inflators that they contracted to purchase from Takata were performing up to the victim OEMs' required standards when, in truth and in fact, they were not.

26.    Defendants TANAKA, NAKAJIMA, and CHIKARAISHI provided and caused the victim OEMs to be provided with false and misleading test information and data relating to the PSAN inflators in DV reports, PV reports, LAT data, and other reports, among other forms. For example:

a.    During the course of the scheme, TANAKA directed a junior engineer to remove test rupture data from a PV report that was provided to an OEM. Months later, NAKAJIMA received and signed an internal test report comparing the actual test data evidencing ruptures with the data included in the PV report that was prepared at TANAKA's direction and provided to the OEM and which did not include the test rupture data. The comparison report that NAKAJIMA received and signed stated that the report prepared at TANAKA's direction "has incorrect data, data that cannot be validated, data that was incorrectly labeled, or data that does not exist."

10

b.      During the course of the scheme, NAKAJIMA signed other PV reports omitting test rupture data with full knowledge that: (i) the reports were false, fraudulent, and misleading; and (ii) the reports would be provided to an OEM.

c.      During the course of the scheme, CHIKARAISHI signed PV reports omitting test data with full knowledge that: (i) the reports were false, fraudulent, and misleading; and (ii) the reports would be provided to OEMs.

27.    The false, fraudulent, and misleading test information and data relating to the PSAN inflators that was provided and caused to be provided to the victim OEMs (typically in test reports) by defendants TANAKA, NAKAJIMA, and CHIKARAISHI related to various matters. Most often, the information and data related to either ballistics or effluent gas. Takata's PSAN inflators had difficulty meeting the OEMs' specifications relating to ballistics and effluent gas.

28.    Ballistic information and data is obtained based on the energy output created by the inflator during airbag deployment. This information and data is gathered, in part, to ensure the safety and efficacy of the PSAN inflator performance during airbag deployment so as not to endanger the lives of vehicle occupant(s), either by under-pressurization—where the airbag does not inflate sufficiently to protect the occupant during a crash—or by over-pressurization—where the airbag inflates with too much pressure, increasing the chance that the PSAN inflator will

11

explode, potentially sending shrapnel into the vehicle and potentially injuring or killing the vehicle occupant(s). Defendants TANAKA, NAKAJIMA, and CHIKARAISHI provided and caused to be provided to the victim OEMs certain ballistic test information and data (typically contained in test reports) relating to PSAN inflators that was fabricated, removed, or altered (either by strategically adding, editing, or changing information and data).

29.     Effluent gas information and data is generally obtained when the airbag inflator initiates. This information and data is gathered, in part, to ensure that airborne toxicity levels resulting from airbag deployment stay within specified safety parameters. Defendants TANAKA, NAKAJIMA, and CHIKARAISHI provided and caused to be provided to the victim OEMs effluent gas test information and data (typically contained in test reports) relating to PSAN inflators that was fabricated, removed, or altered (either by strategically adding, editing, or changing information and data).

30.     The victim OEMs purchased airbag systems containing faulty, inferior, non-performing, non-compliant, or dangerous PSAN inflators based, at least in part, on the false, fraudulent, and misleading test information and data (typically included in test reports) sent and caused to be sent by defendants TANAKA, NAKAJIMA, and CHIKARAISHI to the victim OEMs.

31.    The victim OEMs paid Takata for the airbag systems containing faulty, inferior, non-performing, non-compliant, or dangerous PSAN inflators by transferring funds through interstate and foreign wires from outside the Eastern District of Michigan into the Eastern District of Michigan. These funds were transferred in response to invoices that defendants TANAKA, NAKAJIMA, and CHIKARAISHI caused to be sent by interstate and foreign wires to the victim OEMs from the Eastern District of Michigan to outside the Eastern District of Michigan.

32.    The victim OEMs would not have purchased these airbag systems from Takata as they were had the true and accurate test information and data relating to the PSAN inflators been communicated and made known to them. Moreover, had the victim OEMs been provided with the true and accurate test information and data, the victim OEMs either would have: (a) insisted that any problems with the PSAN inflators be resolved prior to installation into their vehicles; or (b) refused to put the airbag systems containing the faulty or problematic PSAN inflators into their vehicles.

33.    In or around 2008, once the airbag systems containing faulty, inferior, non-performing, non-compliant, or dangerous PSAN inflators began experiencing repeated problems in the field—including ruptures—defendants TANAKA, NAKAJIMA, and CHIKARAISHI, along with others, continued to withhold the true

and accurate PSAN inflator test information and data from the OEMs. This test information and data showed, among other things, PSAN inflator ruptures and failures. The purpose and intent motivating defendants TANAKA, NAKAJIMA, and CHIKARAISHI from disclosing the true and accurate test information and data was to cover-up the criminal fraud scheme.

## The Victims

34.     Various OEMs purchased airbag systems containing faulty, inferior, non-performing, non-compliant, or dangerous PSAN inflators from Takata based on false, fraudulent, and misleading test information and data sent, and caused to be sent, to the victim OEMs by defendants TANAKA, NAKAJIMA, and CHIKARAISHI. As a result of the fraud scheme, the victim OEMs paid Takata over one billion dollars for tens of millions of Takata airbag systems containing faulty, inferior, non-performing, non-compliant, or dangerous PSAN inflators.

35.     Had the victim OEMs known the true and accurate test information and data relating to the PSAN inflators, the faulty, inferior, non-performing, non-compliant, or dangerous PSAN inflators would not have been installed in vehicles sold in the United States. Due to the false and misleading test information and data relating to the PSAN inflators that was provided to the victim OEMs, the victim OEMs placed tens of millions of airbag systems containing faulty, inferior, non-

14

performing, non-compliant, or dangerous PSAN inflators into tens of millions of vehicles that were sold in the United States.

## COUNT ONE
### (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

D-1 SHINICHI TANAKA,
D-2 HIDEO NAKAJIMA, and
D-3 TSUNEO CHIKARAISHI

36.     Paragraphs 1 through 35 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

37.     From at least in or around 2000 through at least in or around 2015, in the Eastern District of Michigan, and elsewhere, defendants,

D-1 SHINICHI TANAKA,
D-2 HIDEO NAKAJIMA, and
D-3 TSUNEO CHIKARAISHI

along with others known and unknown to the grand jury, did knowingly, intentionally, and willfully combine, conspire, confederate, and agree to commit wire fraud, that is, knowingly, willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures,

15

and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Object of the Conspiracy

38.     The object of the conspiracy was the same as the purpose of the scheme to defraud set forth in paragraph 21 of this Indictment, which is realleged and incorporated by reference as though fully set forth herein.

## Manner and Means of the Conspiracy

39.     In furtherance of this conspiracy, and to accomplish its object, the methods, manner, and means that were used are described in paragraphs 22 through 33 of this Indictment and are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH SIX
### (18 U.S.C. §§ 1343 and 2 – Wire Fraud)

40.     Paragraphs 1 through 35 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

41.     From at least in or around 2000 through at least in or around 2015, in the Eastern District of Michigan, and elsewhere, defendants,

D-1 SHINICHI TANAKA,
D-2 HIDEO NAKAJIMA, and
D-3 TSUNEO CHIKARAISHI,

16

aided and abetted by each other and others, did knowingly, willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice.

### Purpose of the Scheme and Artifice to Defraud

42.     The Grand Jury realleges and incorporates by reference paragraph 21 of this Indictment as though fully set forth herein as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice to Defraud

43.     The Grand Jury realleges and incorporates by reference paragraphs 22 through 33 of this Indictment as though fully set forth herein as a description of the scheme and artifice.

### Use of the Wires

44.     On or about the dates specified as to each count below, TANAKA, NAKAJIMA, and CHIKARAISHI, in the Eastern District of Michigan and

elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice, as set forth below:

| Count | Approximate Date | Approximate Amount | Description of Wire Communication |
|---|---|---|---|
| 2 | September 27, 2012 | $22,022.40 | Interstate wire transfer of funds from Pennsylvania to Detroit, Michigan to purchase airbag systems containing PSPI-6 inflators |
| 3 | November 28, 2012 | $42,668.40 | Interstate wire transfer of funds from Pennsylvania to Detroit, Michigan to purchase airbag systems containing PSPI-6 inflators |
| 4 | November 28, 2012 | $35,644.72 | Interstate wire transfer of funds from Pennsylvania to Detroit, Michigan to purchase airbag systems containing PSPI-6 inflators |
| 5 | May 28, 2014 | $7,626.62 | Interstate wire transfer of funds from Pennsylvania to Detroit, Michigan to purchase airbag systems containing PSPI-L inflators |
| 6 | March 31, 2015 | $1,449.37 | Interstate wire transfer of funds from Pennsylvania to Detroit, Michigan to purchase airbag systems containing PSDI-5 inflators |

All in violation of Title 18, United States Code, Sections 1343 and 2.

18

## FORFEITURE ALLEGATION

The Grand Jury further charges that:

45.    Upon conviction of any violation of Title 18, United States Code, Section 1343 as alleged in Counts Two through Six of this Indictment, defendants,

D-1 SHINICHI TANAKA,
D-2 HIDEO NAKAJIMA, and
D-3 TSUNEO CHIKARAISHI

shall forfeit to the United States, jointly and severally, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offenses.

48.    If any of the property described above, as a result of any act or omission of the defendants:

   a.    cannot be located upon the exercise of due diligence;

   b.    has been transferred or sold to, or deposited with, a third party;

   c.    has been placed beyond the jurisdiction of the court;

   d.    has been substantially diminished in value; or

   e.    has been commingled with other property that cannot be divided without difficulty,

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the property described in paragraph 47. All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

**THIS IS A TRUE BILL.**


*s / Grand Jury Foreperson*
Grand Jury Foreperson


BARBARA L. MCQUADE
United States Attorney
Eastern District of Michigan


*s / John K. Neal*
JOHN K. NEAL
Chief, White Collar Crime Unit
ERIN S. SHAW
ANDREW J. YAHKIND
Assistant United States Attorneys
Eastern District of Michigan

ANDREW WEISSMANN
Chief, Criminal Division
Fraud Section
United States Department of Justice


*s / Benjamin D. Singer*
BENJAMIN D. SINGER
Chief, Securities & Financial Fraud Unit
BRIAN K. KIDD
CHRISTOPHER D. JACKSON
ANDREW R. TYLER
Trial Attorneys
Criminal Division, Fraud Section
United States Department of Justice


Dated:   December 7, 2016

| United States District Court<br>Eastern District of Michigan | **Criminal Case Co** | Case:2:16-cr-20810<br>Judge: Steeh, George Caram<br>MJ: Stafford, Elizabeth A.<br>Filed: 12-07-2016 At 04:28 PM<br>SEALED MATTER |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to com

| **Companion Case Information** | **Companion Case Number:** |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | **Judge Assigned:** |
| ☐ Yes    ☒ No | **AUSA's Initials:** _es_ |

**Case Title:** USA v.  Shinichi Tanaka, Hideo Nakajima, and Tsuneo Chikaraishi

**County where offense occurred :** Wayne and Oakland

**Check One:**    ☒ Felony        ☐ Misdemeanor        ☐ Petty

✓ Indictment/____Information --- **no** prior complaint.

____Indictment/____Information --- based upon prior complaint [**Case number:**      ]

____Indictment/____Information --- based upon LCrR 57.10 (d) *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** _____    **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

December 7, 2016
Date

Erin S. Shaw
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone: (313) 226-9182
Fax:    (313) 226-2873
E-Mail address: Erin.Shaw@usdoj.gov
Attorney Bar #:

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.